## IN THE UNITED STATES DISTRICT OF COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DOCKETED
DEC 20 2004

| | |
|---|---|
| Kathleen Sheridan, | |
| Plaintiff, | Case No. 04C 8184 |
| | Judge JUDGE ZAGEL |
| vs. | |
| | Magistrate Judge |
| Argosy University and | MAGISTRATE JUDGE LEVIN |
| Education Management Corporation, | Jury Demand |
| Defendants. | |

## COMPLAINT

Plaintiff, Kathleen Sheridan, by her attorneys, states for her complaint as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory judgment, injunctive relief and damages to redress unlawful discrimination on the basis of gender and retaliation.

2.     This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), as amended by the Civil Rights Act of 1991, and the Equal Pay Act, 29 U.S.C. §206(d).

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343 and 42 U.S.C. §2000e-5(f)(3).

4.     The conduct alleged herein occurred within the Northern District of Illinois, Eastern Division.

5.     Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and was issued Notifications of Right to Sue on October 8, 2004. (Attached)  This Complaint is filed within 90 days thereafter.

1-1

**PARTIES**

6.      Plaintiff Sheridan is a female citizen of the United States who resides in Lake County, Illinois.

7.      Defendant Argosy University ("Argosy") is an Illinois Corporation, maintaining its offices and place of business in Cook County, Illinois. At all relevant times, Argosy has employed more than 500 persons. At all times relevant, Argosy has been and is now an employer in an industry affecting commerce within the meaning of §§7.01(b)(g) and (h) of Title VII, 42 U.S.C. §§2000e (a)(b)(g) and (h).

8.      Defendant Education Management Corporation ("EDMC") owns Argosy University and provides human resources and management oversight jointly with Argosy's management. EDMC is a Pennsylvania corporation, doing business in Cook County, Illinois. At all times relevant, EDMC has been and is now an employer in an industry affecting commerce within the meaning of §§7.01(b)(g) and (h) of Title VII, 42 U.S.C. §§2000e (a)(b)(g) and (h).

9.      EDMC is engaged in the business of providing private post-secondary education in North America. EDMC provides career-oriented education. As of the fiscal year ended June 30, 2004, the company had 67 primary campus locations in 24 states, including Argosy in the Chicago area, and two Canadian provinces. EDMC's educational systems offer a broad range of academic programs concentrated in the media arts, design, fashion, culinary arts, behavioral sciences, health sciences, education, information technology, legal studies and business fields, culminating in the award of associate's through doctoral degrees. During fiscal 2004 EDMC shifted from an educational system approach to a centralized corporate structure utilizing divisions, which have been aggregated into one operating segment.

2

10.     EDMC organizes its campuses, including Argosy campuses, into regions.  Seven regions are divided into three groups, each one overseen by EDMC Group Vice Presidents.

11.     EDMC and Argosy comprise a single employer.  Argosy employees are paid by EDMC. Argosy University System President reports to EDMC.

12.     Argosy is a system of campuses, each which has a Campus President and Campus Vice President for Academic Affairs, who report to an Argosy Central University President and Argosy Central University Vice President for Academic Affairs.  In turn, the Argosy Central University Presidents report to EDMC Regional Vice Presidents, and EDMC Chief Executive Officer and EDMC Chief Operating Officer.

13.     Argosy Campus Vice Presidents report to Campus Presidents and have a "dotted line" reporting relationship with EDMC Regional Vice Presidents, EDMC Chief Executive Officer and EDMC Chief Operating Officer.

14.     Defendants receive federal funding through student financial aid and are thus subject to Title IX concerning sexual harassment of students, which may implicate the adequacy of implementation of their sexual harassment policies and procedures.

## FACTUAL ALLEGATIONS

15.     Plaintiff Sheridan began her employment with Argosy and EDMC (collectively, "defendants") in December 2001 as Vice President of Academic Affairs for the Chicagoland campuses of Argosy, reporting to David Harpool, Campus President.

16.     At all times during her employment with defendants, Sheridan  performed her job responsibilities and assigned responsibilities in a highly competent manner.

17.     On a continuous and ongoing basis since he was hired by defendants, Campus President Harpool engaged in open, obvious, notorious, inappropriate, unwanted sexually harassing conduct

towards many female staff (some of whom were also students) on defendants' Chicago campus. This conduct was widely known and acknowledged, including administrative and executive staff.

18.     On a continuing and ongoing basis from the beginning of her employment through January, 2004, Sheridan was subjected to a sexually hostile work environment in that Campus President Harpool subjected her to severe and pervasive unwanted sexual conduct.  For example, Campus President Harpool repeatedly asked for sex, and continually stated to Sheridan things such as "I want to fuck you," "I'd really like to lick your pussy just once," etc.

19.     Sheridan refused Campus President Harpool's advances and unwanted conduct, but it continued.

20.     Argosy's System Director of Human Resources, David Dvorak, was a close friend of President Harpool's, socialized with him often, and knew or should have known of his unlawful conduct.

21.     It was common knowledge that Campus President Harpool and Dvorak were close friends and often were known to socialize and drink together.

22.     Campus President Harpool acted in a retaliatory fashion towards Sheridan because she refused his requests for sex, including unwarranted criticism, unreasonable demands and unfounded criticisms of her work.

23.     Campus President Harpool told Sheridan that the Human Resources Director of Argosy System, Dvorak, could ruin her career.

24.     Earlier, after Sheridan complained about the inadequacy of defendants' maternity leave policy, Dvorak made statements threatening Sheridan's job.

4

25. Sheridan was discouraged from making complaints as a result of the conduct of Campus President Harpool and the conduct of the Argosy University System Human Resources Director, David Dvorak.

26. Defendants' policies concerning hostile work environment sexual harassment were deficient in substance and application. Additionally, no training was provided.

27. In December 2003, Campus President Harpool was observed by various staff at a company Christmas party engaging in sexually suggestive conduct with a female administrative staff member (and student), Kim Jarvis. Jarvis then widely disclosed to other staff in a public lounge that Harpool was engaging in unwanted sexual conduct towards her (Jarvis).

28. Jarvis complained individually to Sheridan about Harpool one to two weeks after the company Christmas party, during which same time period gossip about Harpool's conduct at the Christmas party towards Jarvis spread around the campus. Jarvis inquired of Sheridan whether the other female victims of Harpool would come forward to support her, especially since Jarvis had received favorable treatment from President Harpool in terms of job perks (best office, trips, etc.). Jarvis told Sheridan that Jarvis' new husband and other staff had seen and found out about Harpool's conduct and were gossiping about her alleged complicity in it.

29. Sheridan confirmed to Jarvis Harpool's unwanted sexual conduct towards her (Sheridan) as well and told Jarvis she would support her and provide information she herself knew.

30. Sheridan told Jarvis to document her sexual harassment complaints against President Harpool and give them to Human Resources.

31. Shortly thereafter, Sheridan learned that Harpool had gained unauthorized access to her computer files and printed and forwarded to himself various of her e mail messages.

32.     Sheridan inquired about Jarvis' situation and Harpool's invasion of her privacy to Pat Breen, Argosy University System Vice President of Academic Affairs, on January 20, 2004.

33.     Sheridan told Breen that Campus President Harpool had frequently engaged in sexually harassing conduct towards her.

34.     Breen encouraged Sheridan to report her own victimization by Campus President Harpool to Dvorak, but Sheridan told Breen Dvorak had previously threatened her job for complaining about the maternity leave policy, that Dvorak was President Harpool's friend, that she believed Dvorak knew about the conduct towards many women but chose to do nothing, and that she feared her job would be threatened if she went to Dvorak.  Sheridan had also previously witnessed Dvorak threatening and  publicly disclosing the identity of an employee at the Argosy San Francisco Campus who had claimed discrimination.  Dvorak openly described the complainant as a "dyke" and said that he was going to get her.

35.     After talking with Breen, Sheridan generally told Dvorak on January 20, 2004 that she had learned of a sexual harassment complaint about Harpool.  Sheridan wrote a memo documenting Jarvis' complaints on January 22, 2004 which she provided to Breen and Dvorak.

36.     A week or so after January 22, 2004, Dvorak discussed Jarvis' complaints with various people, including with Sheridan.  Sheridan told Dvorak that Campus President Harpool had done things to her, too.  Dvorak told Sheridan that Campus President Harpool was going to be gone. Dvorak specifically stated to Sheridan that Harpool's impending exit had nothing to do with the sexual harassment, but was because he was drinking too much and falling apart, that Harpool would be able to receive his stock options, letters of recommendation and that Harpool was his friend.  Dvorak also stated to Sheridan that the EDMC structure was a big mess, that Argosy University System President

O'Brien was trying to make everyone his slave, and that O'Brien expected everyone to bend over and "take it in the ass."

37.     Harpool then resigned from defendants' employment in January 2004 and received letters of recommendation from defendants and a favorable company announcement of his departure was issued by defendants.

38.     No communication about Harpool's conduct or sexual harassment or sexual harassment complaint procedures was disseminated to defendants' employees or students.

39.     Concerning whether she would be selected to replace Harpool, which would have ordinarily occurred, Argosy University System President Greg O'Brien told Sheridan in the presence of John Mazzoni, EDMC Group Vice President (to whom O'Brien reported), that "the victim cannot be the victor in these legal cases." Sheridan was told by Mazzoni she would still manage the campus (as a Campus President would) and would be duly compensated later. Sheridan was thus denied the formal promotion to Campus President on that basis.

40.     Sheridan was thereafter, until a non-victim was selected over her, required to carry out the duties of Campus President in addition to her regular job duties as Campus Vice President of Academic Affairs, but never received additional compensation. Sheridan was at times termed by defendants during this time the "Acting Campus President," "Acting Campus Manager," and was required to attend Argosy System Presidents' meetings, prepare Presidents' reports and vote at Presidents' meetings on behalf of the Chicago Campus.

41.     No one else was performing Harpool's former job besides Sheridan.

42.     Male employees, including Harpool, who perform the same or substantially similar job of Campus President at any of defendants' campuses are paid for carrying out those duties.

7

43.     Sheridan complained between January 2004 and June 2, 2004 about being denied the promotion to Campus President and about not receiving compensation for being required to perform additional duties without compensation or the formal title. These complaints were made to EDMC Group Vice President Mazzoni, Marcia Bankirer (the external female employee selected over Sheridan for Harpool's vacant job as of June 1, 2004) and David Dvorak.

44.     Women who did not complain of gender discrimination or sexual harassment were not denied promotions, including to Campus President jobs.

45.     On June 12, 2004, as she had in the past, Sheridan performed at a student government appreciation event, at which she played guitar and sang three songs that she had written. She introduced one as relating to the subject of sexual harassment.

46.     On June 15, 2004, Bankirer, O'Brien and Dvorak inquired about Sheridan referring to sexual harassment in connection with her performance, claiming it somehow violated confidentiality. Sheridan reiterated that she was a victim of Harpool's widely known and widespread sexual harassment. Bankirer, O'Brien and Dvorak, none of whom were present on June 12, 2004, inaccurately claimed that Sheridan inappropriately singled out Jarvis at the event in connection with the song, and told her that Jarvis had complained to them. Sheridan was told another meeting would be held on June 23, 2004 after they "investigated" the alleged musical performance incident.

47.     In an additional conversation on June 15, 2004, Sheridan told Bankirer about the details of Harpool's sexual harassment of her, and Bankirer admitted it was sickening. Bankirer then told Sheridan, among statements admitting various improper conduct on defendants' part concerning sexual harassment, to keep her sexual harassment and retaliation issues separate from questions she would be asked about her song, and not to bring up her own sexual harassment complaint at the June 23, 2004

meeting. Sheridan told Bankirer that the issues were not separate, that she was still struggling with the issues and that Sheridan did not know what she would do in terms of addressing the situation.

48. On June 22, 2004, Sheridan e-mailed Ron O'Gradnick, EDMC Human Resources Director, and Carol Nichols, EDMC Human Resources Manager, and asked on of them to call her either that night of the next morning because there was a serious HR issue.

49. On the morning of June 23, 2004, not having heard from O'Gradnick and Nichols, Sheridan called O'Gradnick and informed him of the impending meeting, that she was uncomfortable about going into the meeting, explained the singing event, relayed Harpool's sexually harassing conduct towards herself, and said she was not compensated for performing the Campus President job. O'Gradnick said Sheridan was right, he was sorry Harpool did that to her, that Sheridan should be compensated for the six months of work as Campus President and advised Sheridan to attend the meeting nonetheless and "clear the air" of whatever was O'Brien's problem.

50. Sheridan arrived at the June 23, 2004 meeting and had some prepared answers about what she was asked on June 15, 2004 about her song, but was told to wait. Sheridan heard the conversation in the room, that was loud because there was a participant by speaker phone.

51. Bankirer, O'Brien and Dvorak discussed how they were unhappy and that they wanted to just terminate Sheridan because she was a liability concerning the sexual harassment by Harpool (involving herself as well as, presumably, numerous staff and student victims). The person on the speaker phone advised the three live participants that if Sheridan brought up that she herself was sexually harassed, she may have a retaliation claim. Bankirer informed the group that she had advised Sheridan not to discuss sexual harassment at the impending meeting.

52. Sheridan entered the room and told Bankirer, Dvorak and O'Brien that she had heard what they had said and that they were dishonest. Sheridan provided her prepared answers about the

9

musical performance. Sheridan attempted to terminate the meeting because she believed they had been counseled by an attorney. O'Brien directed Sheridan to sit down and said, "ok, this is really about performance issues...it is a performance thing." O'Brien then said, how about if Sheridan resigned in exchange for three months' severance pay and a neutral letter of recommendation. Sheridan said absolutely not. Sheridan said they would have to talk to her attorney.

53.     Sheridan's counsel communicated with defendants, including Bankirer, by e-mail, messenger and mail in the afternoon of June 23, 2004 about her complaints of retaliation, sexual harassment, and gender discrimination.

54.     On June 24, 2004, Sheridan received an overnight letter stating she was terminated from her employment because she allegedly breached confidentiality and the purported integrity of defendants' complaint procedure. This was the first time Sheridan was informed she was terminated.

55.     As a result of all of defendants' conduct and as to each and every count below, Sheridan has suffered and continues to suffer lost wages, benefits, lost stock options and advancement opportunities. Sheridan has and continues to suffer humiliation, mental anguish and emotional distress.

56.     Defendants' conduct as to each and every count below was egregious, intentional and carried out in reckless disregard for Sheridan's federally protected civil rights, and thus Sheridan is entitled to punitive damages.

## COUNT I
### (Title VII - Hostile Work Environment Gender Discrimination)

57.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 of this Complaint.

10

58. By virtue of the foregoing conduct, defendants created and tolerated a work environment hostile to and discriminatory against women, including plaintiff. Defendants' conduct interfered with the ability of plaintiff to perform her job.

59. Defendants are liable for supervisor/manager hostile work environment sexual harassment. Defendants are also liable for hostile work environment sexual harassment because they failed to promptly and adequately respond to sexual harassment of which they were aware, including because of its open and notorious nature known to management, complaints of plaintiff and complaints of other women.

60. The conduct of defendants as described above constitutes intentional sex discrimination in violation of 42 U.S.C. Section 2000e et. seq. as amended.

61. As a result of the unlawful conduct of defendants, the terms and conditions of plaintiff's employment were adversely affected for which she is entitled to compensatory damages.

62. Plaintiff demands trial by jury.

## COUNT II
### (Title VII - Gender Discrimination in Failure To Promote and Compensation)

63. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 of this Complaint.

64. Defendants' conduct towards plaintiff in refusing to promote her to Campus President because she was a victim of sexual harassment constitutes unlawful gender discrimination in the terms and conditions of her employment.

65. Defendants' conduct towards plaintiff in requiring her to perform the duties of Campus President while not compensating her or formally promoting her to the job constitutes unlawful gender discrimination in the terms and conditions of her employment.

11

66.     The conduct of defendants as described above constitutes intentional sex discrimination in violation of 42 U.S.C. Section 2000e et. seq. as amended.

67.     As a result of the unlawful conduct of defendants, the terms and conditions of plaintiff's employment were adversely affected for which she is entitled to compensatory damages.

68.     Any reasons for defendants' conduct are pretextual.

69.     Plaintiff demands trial by jury.

### COUNT III
### (Retaliation in Violation of Title VII)

70.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 of this Complaint.

71.     After plaintiff complained to Harpool and to management concerning the sexually harassing and otherwise unlawful conduct that she was (and others were) subjected to in the workplace, defendants engaged in retaliatory action against her.

72.     Defendants also acted in a retaliatory fashion to terminate plaintiff because she was a witness concerning widespread sexual harassment of staff and students.

73.     This retaliatory conduct included, but is not limited to, the following: ( a ) unwarranted scrutiny and criticism by Harpool and managers relying on his criticism of plaintiff's performance, ( b ) threats about loss of her job ( c ) failure to promote plaintiff to Campus President, (d ) failure to compensate plaintiff for performing duties of Campus President, and ( e ) termination of plaintiff's employment.

74.     Any reasons for defendants' retaliatory conduct are pretextual.

75.     Defendants' retaliatory conduct has adversely affected the terms and conditions of plaintiff's employment and violated Title VII of the Civil Rights Act, as amended.  As a result of

defendants' retaliatory conduct, plaintiff has suffered damages for which she is entitled to compensation.

76.    Plaintiff demands trial by jury.

## COUNT IV
### (Equal Pay Act)

77.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 56 of this Complaint.

78.    Defendants' conduct violated the Equal Pay Act, 29 U.S.C. Sect. 206(d), inasmuch as defendants paid plaintiff less than male employees who worked in similar working conditions and performed comparable work, requiring comparable skills, effort and responsibility (including Harpool and other male Campus Presidents).

79.    Defendants' conduct was wilful and/or in reckless disregard of whether the conduct was prohibited under the Equal Pay Act.

80.    Any reasons for this conduct are pretextual.

81.    Plaintiff requests trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for the following relief:

A.    As to each count, plaintiff requests that the Court enter a declaratory judgment finding that defendant has engaged in the conduct alleged, in violation of applicable laws.

B.    As to each count, plaintiff requests that the Court grant plaintiff an injunction, requiring defendants to reinstate plaintiff and refrain from future discriminatory and retaliatory conduct towards plaintiff and other female employees.

C.    As to each count, plaintiff seeks an award of back pay and any other out-of-pocket damages.

D.    As to each count, plaintiff seeks an award of compensatory damages in the maximum amount permissible under the applicable statutes (and as to the Equal Pay Act any

13

increase of damages as permitted by the statute in view of the intentional and egregious conduct).

E.      As to each count, plaintiff seeks an award of attorney's fees and costs.

F.      As to each count, plaintiff seeks an award of punitive damages.

Respectfully Submitted,

Jennifer K. Soule, One of Plaintiff's Attorneys

Dated: December 17, 2004

Jennifer K. Soule
Kelly K. Lambert
James G. Bradtke
**Soule, Bradtke & Lambert**
155 North Michigan Avenue
Suite 500
Chicago, Illinois 60601
312-616-4422

C:\Corel\Cases\Sheridan\Pleadings\Complaint.wpd

14

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE

**(Issued on request)**

| To: | Kathleen Sheridan | From: |
|---|---|---|
| | 311 Fourth Street | Equal Employment Opportunity Commission |
| | Wilmette, IL 60091 | 500 West Madison |
| | | Suite 2800 |
| | Certified: 7099 3400 0006 7304 4509 CP Atty | Chicago, Illinois 60661 |

☐ *On behalf of a person aggrieved whose identity is CONFIDENTIAL (29 C.F.R. 1601.7(a))*

| Charge Number | EEOC Representative | Telephone Number |
|---|---|---|
| 210-2004-05797 | Regina Husar, Enforcement Supervisor | (312) 353-8109 |

( See the additional information attached to this form )

**TO THE PERSON AGGRIEVED:** This is your NOTICE OF RIGHT TO SUE. It is issued at your request. If you intend to sue the respondent(s) named in your charge, YOU MUST DO SO WITHIN NINETY (90) DAYS OF YOUR RECEIPT OF THIS NOTICE: OTHERWISE YOUR RIGHT TO SUE IS LOST.

☐ More than 180 days have expired since the filing of this charge.

☒ Less than 180 days have expired since the filing of this charge, but I have determined that the Commission will be unable to complete its process within 180 days from the filing of the charge.

☒ With the issuance of this NOTICE OF RIGHT TO SUE, the Commission is terminating its process with respect to this charge.

☐ It has been determined that the Commission will continue to investigate your charge.

☐ **ADEA:** While Title VII and the ADA require EEOC to issue this notice of right to sue before you can bring a lawsuit, you may sue under the Age Discrimination in Employment Act (ADEA) any time 60 days after your charge was filed until **90 days after you received notice that EEOC has completed action on your charge.**

☐ **Because EEOC is closing your case,** your lawsuit under the ADEA must be brought within 90 days of your receipt of this notice. Otherwise, your right to sue is lost.

☐ **EEOC is continuing its investigation.** You will be notified when we have completed action and, if appropriate, our notice will include notice of right to sue under the ADEA.

☐ **EPA:** While Title VII and the ADA require EEOC to issue this Notice of Right to Sue before you can bring a lawsuit, you already have the right to sue under the Equal Pay Act (EPA) (You are not required to complain to any enforcement agency before bringing an EPA suit in court). EPA suits must be brought within 2 years (3 years for willful violations) of the alleged EPA underpayment.

On Behalf of the Commission

*October 8, 2004*
(Date)

*John P. Rowe* [signature]
John P. Rowe, District Director

Enclosures
    Information Sheet
    Copy of Charge

cc: Respondent(s)    Argosy University and Education Management
                 Corporation

EEOC Form 161-B (Test 10/94)

 

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS



# Civil Cover Sheet 8184

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

JUDGE ZAGEL

---

**Plaintiff(s): Kathleen Sheridan**

**County of Residence:**

**Plaintiff's Atty:**  Jennifer K. Soule
Soule, Bradtke & Lambert
155 N. Michigan Ave., #500
Chicago, IL 60601
312-616-4422

**Defendant(s):** Argosy University and Education Management Corporation

**County of Residence:** MAGISTRATE JUDGE LEVIN

**Defendant's Atty:**

---

**II. Basis of Jurisdiction:**  3. Federal Question (U.S. not a party)

**III. Citizenship of Principal Parties (Diversity Cases Only)**
      Plaintiff:  - N/A
      Defendant:  - N/A

**IV. Origin**  1. Original Proceeding

**V. Nature of Suit**  442 Employment

**VI. Cause of Action:**  This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended by the Civil Rights Act of 1991, and the Equal Pay Act, 29 U.S.C. §206(d).

**VII. Requested in Complaint**
      Class Action:  No
      Dollar Demand:  $300,000 + Fees/Costs + E.P.A. Enhancement
      Jury Demand:  Yes

**VIII. This case IS NOT a refiling of a previously dismissed case.**

---

Signature:

Date:  December 17, 2004

1-2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**Kathleen Sheridan**

-v-

**Argosy University and Education Management Corporation**

**Case Number:**

04C 8184

DOCKETED
DEC 2 0 2004

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

**KATHLEEN SHERIDAN, PLAINTIFF**

JUDGE ZAGEL

MAGISTRATE JUDGE LEVIN

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME  Jennifer K. Soule | NAME  Kelly K. Lambert |
| FIRM  Soule, Bradtke & Lambert | FIRM  Soule, Bradtke & Lambert |
| STREET ADDRESS  155 North Michigan Avenue, Suite 500 | STREET ADDRESS  155 North Michigan Avenue, Suite 500 |
| CITY/STATE/ZIP  Chicago, Illinois  60601 | CITY/STATE/ZIP  Chicago, Illinois  60601 |
| TELEPHONE NUMBER  312-616-4422  FAX NUMBER  312-616-4422 | TELEPHONE NUMBER  312-616-4422  FAX NUMBER  312-616-4422 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  06198467 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  06201523 |
| MEMBER OF TRIAL BAR?          YES ■    NO ☐ | MEMBER OF TRIAL BAR?          YES ■    NO ☐ |
| TRIAL ATTORNEY?               YES ■    NO ☐ | TRIAL ATTORNEY?               YES ■    NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?       YES ☐    NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME  James G. Bradtke | NAME |
| FIRM  Soule, Bradtke & Lambert | FIRM |
| STREET ADDRESS  155 North Michigan Avenue, Suite 500 | STREET ADDRESS |
| CITY/STATE/ZIP  Chicago, Illinois  60601 | CITY/STATE/ZIP |
| TELEPHONE NUMBER  312-616-4422  FAX NUMBER  312-616-4422 | TELEPHONE NUMBER                FAX NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  06183694 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?          YES ■    NO ☐ | MEMBER OF TRIAL BAR?          YES ☐    NO ☐ |
| TRIAL ATTORNEY?               YES ■    NO ☐ | TRIAL ATTORNEY?               YES ☐    NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐    NO ■ | DESIGNATED AS LOCAL COUNSEL?   YES ☐    NO ☐ |

1-3